# Constitutional Issues Raised by Commerce, Justice, and State Appropriations Bill

A provision prohibiting the use of appropriated funds for United Nations peacekeeping missions involving the use of United States Armed Forces under the command of a foreign national unconstitutionally constrains the President's authority as Commander in Chief and his authority over foreign affairs.

A provision prohibiting the use of appropriated funds for cooperation with, assistance to, or other support for the International Criminal Court would be unconstitutional insofar as it would prohibit the President from providing support and assistance to the ICC under any and all circumstances, but it can be applied in a manner consistent with the President's constitutional authority in the area of foreign affairs.

November 28, 2001

MEMORANDUM OPINION FOR THE DEPUTY COUNSEL TO THE PRESIDENT

This memorandum responds to your request for our views on four provisions in H.R. 2500, the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Bill for Fiscal Year 2002, 107th Cong. (2001) ("CJS appropriations bill"): sections 609 (participation in United Nations peacekeeping), 612 (Department of Justice anti-terrorism restructuring), 626 (removing foreign sovereign immunity in pending Iran hostages litigation), and 630 (support for International Criminal Court).

We conclude that section 626 does not raise constitutional concerns, but that section 609 unconstitutionally constrains the President's Commander-in-Chief and foreign affairs authority, section 612 represents the sort of legislative micromanagement of the Executive Branch that should be resisted on separation of powers policy grounds, and application of section 630 in certain circumstances would unconstitutionally interfere with the President's foreign affairs authority.

## I. Section 609

Section 609 provides that:

> None of the funds made available by this Act may be used for any United Nations undertaking when it is made known to the Federal official having authority to obligate or expend such funds: (1) that the United Nations undertaking is a peacekeeping mission; (2) that such undertaking will involve United States Armed Forces under the command or operational control of a foreign national; and (3) that the President's military advisors have not submitted to the President a recommendation that such involvement is in the national security

279

interests of the United States and the President has not submitted to
the Congress such a recommendation.

Section 609 thus prohibits the use of appropriated funds (by entities receiving
appropriations under the CJS appropriations bill) for the participation of United
States Armed Forces in a United Nations peacekeeping mission under foreign
command, unless the President's military advisors have recommended such
involvement and the President has submitted such recommendation to Congress.
This provision first appeared in CJS appropriations bills in 1996. We have
consistently taken the position that it is unconstitutional and have submitted
signing statement language saying that the provision unconstitutionally constrains
the President's Commander-in-Chief authority and that the President will apply it
consistent with his constitutional responsibilities.

Our position has been based on the analysis that it is unconstitutional for Con-
gress to place conditions, whether substantive or procedural, on the President's
exercise of his constitutional authority—as Commander in Chief and with respect
to the conduct of diplomacy—to order United States military participation in an
United Nations peacekeeping operation. Specifically, it is unconstitutional to
require the President to satisfy the requirements set forth in section 609: that the
President's military advisors have recommended that the involvement in the
peacekeeping operation is in the national security interests of the United States and
that the recommendation has been submitted to Congress.

Our analysis starts with the constitutional principle that responsibility for the
conduct of foreign affairs and for protecting the national security are "'central'
Presidential domains." *Harlow v. Fitzgerald*, 457 U.S. 800, 812 n.19 (1982). The
President's constitutional responsibilities in both these areas flow from the specific
grants of authority in Article II making him Chief Executive, U.S. Const. art. II,
§ 1, cl. 1, and Commander in Chief, *id*. art. II, § 2, cl.1, *see Nixon v. Fitzgerald*,
457 U.S. 731, 749-50 (1982), as well as from the "unique position" that the
President occupies in the constitutional structure, *id*. at 749. The President's
exclusive authority to conduct the Nation's diplomatic relations with other States
derives primarily from the Vesting Clause and the Commander-in-Chief Clause,
and is buttressed by the President's more specific powers to "make Treaties," U.S.
Const. art. II, § 2, cl. 2; to "appoint Ambassadors . . . and Consuls," *id*.; and to
"receive Ambassadors and other public Ministers," *id*. art. II, § 3.

The Supreme Court has consistently "recognized 'the generally accepted view
that foreign policy [is] the province and responsibility of the Executive.'" *Dep't of
Navy v. Egan*, 484 U.S. 518, 529 (1988) (quoting *Haig v. Agee*, 453 U.S. 280, 293-
94 (1981)). *See also Ludecke v. Watkins*, 335 U.S. 160, 173 (1948) (President is
the nation's "guiding organ in the conduct of our foreign affairs"); *Ex parte
Hennen*, 38 U.S. (13 Pet.) 230, 235 (1839) ("As the executive magistrate of the
country, he is the only functionary intrusted with the foreign relations of the

nation."); Secretary of State Thomas Jefferson, Opinion on the Question Whether the Senate Has the Right to Negative the Grade of Persons Appointed by the Executive to Fill Foreign Missions (Apr. 24, 1790), *in* 5 *The Writings of Thomas Jefferson* 161 (Paul L. Ford ed., 1895); *The President's Compliance with the "Timely Notification" Requirement of Section 501(b) of the National Security Act*, 10 Op. O.L.C. 159, 162 (1986) ("The presumptively exclusive authority of the President in foreign affairs was asserted at the outset by George Washington and acknowledged by the First Congress.").

It is vital to the President's ability to conduct diplomatic relations that he should have the authority to deploy United States Armed Forces in the international arena, and be able to threaten credibly to do so.[1] Furthermore, the authority to deploy military force in the defense of the security and interests of the United States is expressly placed under the President's authority by the Commander-in-Chief Clause, U.S. Const. art. II, § 2, cl. 1. The "inherent powers" of the President as Commander in Chief are "clearly extensive." *Loving v. United States*, 517 U.S. 748, 776 (1996) (Scalia, J., concurring in part and concurring in the judgment). As Attorney General, later Justice, Robert Jackson explained:

> Article II, section 2, of the Constitution provides that the President "shall be Commander in Chief of the Army and Navy of the United States." By virtue of this constitutional office he has supreme command over the land and naval forces of the country and may order them to perform such military duties as, in his opinion, are necessary or appropriate for the defense of the United States. These powers exist in time of peace as well as in time of war. . . .
>
> Thus the President's responsibility as Commander in Chief embraces the authority to command and direct the armed forces in their immediate movements and operations designed to protect the security and effectuate the defense of the United States. . . . [T]his authority undoubtedly includes the power to dispose of troops and equipment in such manner and on such duties as best to promote the safety of the country.

---

[1] Longstanding historical practice supports the claim of presidential authority to deploy the armed forces as a tool of foreign policy. *See, e.g.*, *Memorandum on the Authority of the President to Repel the Attack in Korea*, 23 Dep't of State Bull. 173, 174 (1950) (historical practice supports use of United States forces "in the broad interests of American foreign policy"). The President has "'authority to commit troops overseas without specific prior Congressional approval "on missions of good will or rescue, or for the purpose of protecting American lives or property or American interests."'" *The President's Constitutional Authority to Conduct Military Operations Against Terrorists and Nations Supporting Them*, 25 Op. O.L.C. 188, 197 (2001) (quoting *Authority to Use United States Military Forces in Somalia*, 16 Op. O.L.C. 6, 6 (1992) (Barr, A.G.) (quoting *Training of British Flying Students in the United States*, 40 Op. Att'y Gen. 58, 62 (1941) (Jackson, A.G.))).

*Training of British Flying Students in the United States*, 40 Op. Att'y Gen. 58, 61-62 (1941).

Congress cannot, in the manner set forth in section 609, place impediments on the President's ability to deploy United States forces abroad for purposes he deems vital to the national security.[2] As we have noted, long historical practice supports the legitimacy of the President's deploying military forces abroad in order to protect the nation's security and to uphold its interests. Moreover, as Commander in Chief, the President must be able to determine, not only *whether* United States Armed Forces are to be deployed abroad, but also *under what conditions* they are to be deployed. Thus, the President has the authority to decide, within applicable constitutional limits, what command structures the forces deployed are to have, what tactics they are to adopt, what military objectives they are to pursue, and—most relevantly here—whether and how they are to cooperate with foreign or international forces in the same theater of operations. Such decisions implicate both military and diplomatic judgments which the President alone is constitutionally empowered to make. Taking account of military needs and of foreign relations, the President may well conclude, in particular circumstances, that it serves the nation's security and foreign policy best to deploy our forces as part of a United Nations operation, rather than unilaterally (or not at all).[3] Congress is without power to prevent the President from acting on that conclusion.

The fact that in section 609 Congress is placing a condition on the President's exercise of his constitutional authority indirectly, through the appropriations process, rather than as a direct mandate, does not change our conclusion. "Broad as the spending power of the Legislative Branch undoubtedly is, it is clear that Congress may not deploy it to accomplish unconstitutional ends." *Presidential Certification Regarding the Provision of Documents to the House of Representatives Under the Mexican Debt Disclosure Act*, 20 Op. O.L.C. 253, 266 (1996). Of particular relevance in the present context is the principle that "'Congress cannot use the appropriations power to control a Presidential power that is beyond its direct control.'" *Id*. (citation omitted).

The Executive Branch's insistence on this principle is longstanding. In 1860, President Buchanan issued a signing statement denying Congress's power to interfere with his authority to issue orders to military officers through the device of

---

[2] None of Congress's enumerated powers in Article I appears to provide a basis for limiting, in the manner proposed by the bill, the authority of the President to make the deployments in question. We do not see, for example, how the proposed prohibition on deployments could fairly be described as an exercise of Congress's power to "declare War," U.S. Const. art. I, § 8, cl. 11; of the power to "raise and support Armies," *id*. cl. 12; or to "make Rules for the Government and Regulation of the land and naval Forces," *id*. cl. 14.

[3] *See* John C. Yoo, *Kosovo, War Powers, and the Multilateral Future*, 148 U. Pa. L. Rev. 1673, 1707-08 (2000) (explaining why multilateralism was preferable to unilateralism from the United States' point of view in responding to crisis in Kosovo).

a condition on the availability of appropriated funds. The President therefore construed the statute at issue not to work such an interference. *See* Signing Statement of President Buchanan to the House of Representatives (1860), *reprinted in* 7 *A Compilation of the Messages and Papers of the Presidents* 3128 (James D. Richardson ed., 1897). The views expressed in the signing statement were subsequently reviewed and endorsed by an opinion the President requested from Attorney General Black. The Attorney General wrote that "[i]f Congress had really intended to [interfere with the President's command authority], that purpose could not be accomplished in this indirect manner any more than if it was attempted directly." *Memorial of Captain Meigs*, 9 Op. Att'y Gen. 462, 469 (1860). Since that time, the Executive has consistently denied the binding effect of appropriations conditions that violate the constitutional separation of powers or usurp the President's constitutional authority.

Finally, we do not think that section 609's authorization to participate in a peacekeeping operation if the President's military advisors have recommended the participation and the recommendation has been submitted to Congress saves section 609 from unconstitutionality. Congress can exempt the President from a legislative restriction only if it has the authority to impose that restriction in the first place. For the reasons stated above, we do not think Congress has such power.

## II. Section 612

Section 612 addresses the subject of the organization of the Department of Justice with respect to combating terrorism. Subsection (a) of section 612 requires the President to

> submit as part of the fiscal year 2003 budget to Congress a proposal to restructure the Department of Justice to include a coordinator of Department of Justice activities relating to combating domestic terrorism, including State and local grant programs subject to the authority of the Attorney General, and who will serve as the Department of Justice representative at interagency meetings on combating terrorism below the Cabinet level.

Viewed in isolation, subsection (a) appears to require the President to submit a legislative proposal to Congress, which would raise constitutional concerns under the Recommendations Clause, which provides that the President "shall from time to time . . . recommend to [Congress] . . . such Measures as he shall judge necessary and expedient." U.S. Const. art. II, § 3. Under the Recommendations Clause, Congress cannot compel the President to submit legislative proposals to Congress.

When subsection (a) is read in conjunction with the remainder of section 612, however, it is apparent that section 612 does not require the President to submit a

legislative proposal. Rather, he is being given the choice of submitting a legislative proposal under subsection (a) or acquiescing in the congressional proposal set forth in the remainder of section 612. Subsection (b) provides that "[i]f the President does not submit a proposal as described in subsection (a), or if Congress fails to enact legislation establishing a new position described in subsection (a), by June 30, 2002, then effective on such date subsections (c) through (f) [the remaining provisions of section 612] shall take effect." Those remaining subsections establish the position of Deputy Attorney General for Combating Domestic Terrorism.

Thus, the legislative proposal provision of subsection (a) is not a mandatory requirement for the President, but is merely part of a mechanism created by the entirety of section 612, under which the congressional enactment set forth in subsections (c) through (f) will go into effect if the President does not propose an alternative approach to restructuring the Department of Justice to deal with terrorism. The President is not required by section 612(a) to submit legislation to Congress because he has the choice of accepting the congressional approach set forth in the rest of section 612.

Although we do not believe that section 612 violates the Recommendations Clause, it does represent the sort of legislative micromanagement of the Executive Branch that we have objected to in the past. *See Common Legislative Encroachments on Executive Branch Authority*, 13 Op. O.L.C. 248, 253-54 (1989) (stating that "Congress' recent interest in determining the precise organizational structure of executive branch departments . . . seriously threatens the executive branch's ability to effectively and efficiently fulfill its obligations"). By requiring that a particular executive officer coordinate specific policy and executive decisions, section 612 infringes upon the President's constitutional authority to direct the activities of the Executive Branch. While Congress has broad authority to determine what laws the President must enforce, we do not believe that Congress has an entirely free hand in determining how the Executive Branch must be organized to enforce those laws. Indeed, if it did, the Executive Branch would be substantially controlled and administered by the Legislative Branch. Thus, on separation of powers policy grounds, we believe that Congress's effort to restructure the Department of Justice should be vigorously resisted.

### III. Section 626

Subsection (c) of section 626 would amend provisions of the Foreign Sovereign Immunities Act ("FSIA") that establish the circumstances in which foreign states are not immune from the jurisdiction of the courts of the United States in civil actions brought against them. Section 626(c) would amend section 1605(a)(7)(A) of the FSIA by specifying that any "act . . . related to" a designated case against the Government of Iran presently pending in the U.S. District Court for the District

of Columbia is not protected by foreign sovereign immunity under the FSIA. The case designated in the provision is *Roeder v. Islamic Republic of Iran*, No. 1:00CV03110(ESG) (D.D.C.). That case, we are advised, is based upon the Iranian Government's actions in connection with the detention and mistreatment of hostages in the U.S. Embassy in Teheran in 1979. The Civil Division advises that a default judgment has been entered against Iran in that case and proceedings to assess damages remain to be held in the U.S. District Court. The United States has filed a motion to intervene and a motion to vacate the judgment, which motions are presently pending.

We do not believe section 626(c) raises constitutional concerns. This provision would merely establish by statute that Iran does not have sovereign immunity in U.S. courts with respect to the acts related to the Iran hostage crisis that form the basis of the claim in *Roeder*—a claim that is the subject of ongoing litigation and which has not been reduced to final judgment. Nothing in the Constitution bars Congress from enacting such legislation. In particular, the provision does not violate the principles of the Supreme Court's precedents in *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995), or *United States v. Klein*, 80 U.S. (13 Wall.) 128 (1871). Under *Plaut*, Congress may not enact legislation that requires federal courts to reopen or otherwise alter *final judgments*. Because the *Roeder* case has not been reduced to final judgment, the *Plaut* principle is inapplicable. Even if the default judgment in question were a final judgment at this stage, section 626(c) would still not appear to violate *Plaut* because (by denying sovereign immunity) it appears to reinforce, rather than reopen, the validity of the judgment against Iran. *Klein*, on the other hand, is sometimes cited for the general proposition that Congress may not prescribe to the courts a rule of decision to dictate the court's interpretation of the law in a particular case. *Klein* does not, however, prohibit Congress from *changing the underlying law* that governs in a pending case, even if that case was still pending when the change in the law was made. As explained by the Supreme Court in *Plaut*, "[w]hatever the precise scope of *Klein*, . . . later decisions have made clear that its prohibition does not take hold when Congress 'amend[s] applicable law.'" 514 U.S. at 218 (quoting *Robertson v. Seattle Audubon Soc.*, 503 U.S. 429, 441 (1992)).

In addition, we do not believe that section 626(c) is constitutionally objectionable as an improper congressional interference with the President's foreign affairs powers. The Supreme Court has firmly upheld the constitutionality of the FSIA's regulation of foreign sovereign immunity as a valid exercise of Congress's power to regulate foreign commerce and as falling within the proper bounds of Congress's Article III powers as well. *See Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 496-97 (1983). Although the provisions of section 626(c) are very specific in their coverage, we cannot say that they exceed the proper scope of

legislative regulation upheld by the courts in granting or withholding sovereign immunity to foreign states in the courts of the United States.[4]

## IV. Section 630

Section 630 provides that "[n]one of the funds appropriated or otherwise made available by this Act shall be available for cooperation with, or assistance or other support to, the International Criminal Court [("ICC")] or [its] Preparatory Commission [("Commission")]." We believe that section 630 would be unconstitutional to the extent that it would prohibit the President, through his subordinates, from providing support and assistance to the ICC or the Commission under any and all circumstances. Therefore, we have submitted signing statement language saying that the President will apply this provision consistent with his constitutional authority in the area of foreign affairs.

Section 630 can be given effect consistent with the Constitution. Prohibiting technical or ministerial cooperation with or assistance to the ICC or the Commission would generally not interfere with the President's exercise of his constitutional authority, and therefore as applied to those circumstances section 630 would not be constitutionally problematic.

Serious as-applied constitutional difficulties would arise under section 630, however, if its prohibition were to apply to certain diplomatic activities or substantive positions the President might take with respect to or before the ICC or the Commission. The Constitution commits to the President the primary responsibility for conducting the foreign relations of the United States, *see, e.g.*, *Dep't of Navy v. Egan*, 484 U.S. at 529 (the Supreme Court has "recognized 'the generally accepted view that foreign policy was the province and responsibility of the Executive'") (quoting *Haig v. Agee*, 453 U.S. 280, 293-94 (1981)); *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 705-06 n.18 (1976) ("[T]he conduct of [foreign policy] is committed primarily to the Executive Branch."), and the exclusive responsibility for formulating the position of the United States in international fora and for conducting negotiations with foreign nations, *see, e.g.*, *United States v. Louisiana*, 363 U.S. 1, 35 (1960) (the President is "the constitutional representative of the United States in its dealings with foreign nations").

---

[4] Two other issues have been raised by section 626. Subsections (a) and (b) purport to require the President to submit to Congress a detailed legislative proposal dictated by Congress and thus raise clear concerns under the Recommendations Clause. This issue is straightforward, and we have already addressed it in our comments to the Office of Management and Budget, which have included recommended language for the President's signing statement. In addition, the National Security Council staff has submitted signing statement language indicating that the Executive Branch will act, and encourage the courts to act, with regard to subsection (c)'s removal of Iran's sovereign immunity in the pending litigation, in a manner consistent with the obligations of the United States under the 1981 Algiers Accords that achieved the release of the hostages. This Office has cleared that language.

Thus, there might well be circumstances in which the President finds it necessary, in the exercise of his constitutional responsibilities, to order an executive agency to provide support or assistance to the ICC or the Commission. For example, the President might find that it served overriding United States national security and foreign policy interests to assist the ICC in investigating, capturing, or prosecuting a prominent foreign individual whose activities threaten American lives and interests. Failure to assist the ICC in such efforts by, for example, supplying intelligence information on the whereabouts or activities of such an individual could do serious and lasting harm to United States security and its international standing.

It will therefore be important in applying section 630 to interpret the terms "cooperation," "assistance," and "support" in a way that is consistent with the understanding that the provision cannot constitutionally limit the President's exercise of his constitutional responsibilities. Properly understood, however, these terms should not unconstitutionally constrain the President. For example, in light of the President's exclusive constitutional responsibilities for the conduct of diplomacy, we would not interpret the Executive Branch's participation in negotiations concerning the ICC to constitute cooperation, assistance, or support.

Similarly, we do not believe the section 630 prohibition could constitutionally be applied to the sharing of intelligence information with the ICC concerning an alleged terrorist who has been brought before the ICC. As Chief Executive and Commander in Chief, the President has independent authority to gather intelligence and to control access to national security information. The Supreme Court has specifically recognized the President's constitutional authority to control the disclosure of classified information:

> The President . . . is the "Commander in Chief of the Army and Navy of the United States." . . . His authority to classify and control access to information bearing on national security . . . flows primarily from this constitutional investment of power in the President and exists quite apart from any explicit congressional grant. . . . This Court has recognized the Government's "compelling interest" in withholding national security information from unauthorized persons in the course of executive business. . . . The authority to protect such information falls on the President as head of the Executive Branch and as Commander in Chief.

*Dep't of Navy v. Egan*, 484 U.S. at 527. *See also New York Times Co. v. United States*, 403 U.S. 713, 728-29 (1971) (Stewart, J., concurring) ("If the Constitution gives the Executive a large degree of unshared power in the conduct of foreign affairs and the maintenance of our national defense, then under the Constitution the Executive must have the largely unshared duty to determine and preserve the

degree of internal security necessary to exercise that power successfully."). Implicit in the President's authority to gather such information and to control access to it is the authority to disclose it to foreign nations or to international bodies if, in the exercise of his diplomatic responsibilities, he finds it proper to do so.

The President may well find it necessary or advisable in particular circumstances to disclose classified information to foreign nations or to international bodies in order to promote this nation's diplomatic objectives or to guard its interests and security. Such disclosure is a legitimate—and often, an unavoidable—exercise of the President's diplomatic and military responsibilities. For example, the President may find it necessary to disclose to a foreign government classified information about the identity or whereabouts of a foreign terrorist, or about the extent to which that government's security has been compromised by a third country's intelligence operations. Or the President may need to warn a potential enemy nation (even if the information disclosed is classified) about United States military planning and capabilities, in order to deter that country from acts of aggression.

JOHN C. YOO
*Deputy Assistant Attorney General*
*Office of Legal Counsel*